IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JANE DOE 1, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:22-cv-00163 |
| | ) | |
| ROANOKE COUNTY SCHOOL BOARD, | ) | By: Elizabeth K. Dillon |
| et al., | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Five former female Northside High School students in Roanoke, Virginia, brought this action, alleging that they were subjected to sexual harassment and grooming behavior by a school employee, Lorstan Allen.  Plaintiffs allege violations of their rights under Title IX, 29 U.S.C. § 1681(a); equal protection, substantive due process, failure-to-train, and supervisory liability claims pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 1983; and state-law claims for gross negligence, battery, assault, and intentional infliction of emotional distress.  Defendants Roanoke County School Board (School Board) and six Northside administrators (collectively referred to as the School Administrators) move to dismiss.[1]  (Dkt. No. 42.)

For the following reasons, defendants' motion to dismiss will be granted in part and denied in part.

---

[1] Defendant Lorstan Allen, the allegedly offending school employee, is the only defendant that has not moved to dismiss.

I.  BACKGROUND[2]

## A.  The Parties

### 1.  Roanoke County School Board and School Administrators

The Roanoke County School Board is charged with the operation of the public schools in Roanoke County, Virginia.  The School Administrators sued in this action are Dr. Daniel Lyons, Northside Interim Principal from February 19, 2016, to June 30, 2016; Dominick McKee, Northside Principal from July 1, 2016, to June 30, 2019; Jason Breeding, Northside Principal from July 1, 2019, to June 30, 2020; Jill Green, Northside Principal since July 1, 2020; Christopher Morris, Northside Assistant Principal since July 1, 2017; and Laurie McCracken, Northside Assistant Principal since July 1, 2016.

### 2.  Lorstan Allen

Defendant Lorstan Allen was employed as Northside's IT Specialist, Boys' Soccer Coach, and Boys' Wrestling Coach when plaintiffs, Jane Does 1–5, were Northside students.  (Am. Compl. ¶¶ 17, 21, Dkt. No. 15.)  Allen had a private office, as well as the ability to call students out of class to come to his office at any time during the school day.  (*Id.* ¶ 22.)

### 3.  Jane Does 1–5 and their interaction with Allen

#### a.  *Jane Doe 1*

Jane Doe 1 was a Northside student from August 2015 through May 2019.  Jane Doe 1 met Allen during the fall of her freshman year when she picked up her school-issued laptop.  During the second semester of her freshman year, Jane Doe 1, at Allen's suggestion, kept her after-school

---

[2] The following factual background is taken from the allegations in the amended complaint, which are accepted as true for purposes of this motion.

sports bag in Allen's office.  She would stop in his office for snacks and began eating her lunch in Allen's office.  (Am. Compl. ¶¶ 26–28.)

During Jane Doe 1's sophomore year, Allen gave her his phone number, his social media information (such as Snapchat and Instagram), and offered to give her rides to soccer practice after school.  Allen and Jane Doe 1 ate breakfast and lunch together in his office.  During these encounters, the solid wood door to his office was closed, at Allen's insistence.  Continuing during her sophomore year, Allen confided details of his personal life to Jane Doe 1, and Allen insisted that Jane Doe 1 share details of her personal life with him.  Allen made suggestive comments to Jane Doe 1, such as that he would want to date Jane Doe 1 if they were the same age.  (*Id.* ¶¶ 29–31.)

Allen offered to help Jane Doe 1 with her math homework during her study halls.  Students, teachers, coaches, and other staff referred to Jane Doe 1 as Allen's assistant because she spent so much time with him.  In a typical day, Jane Doe 1 would attend her morning classes, go to study hall and lunch (back to back) in Allen's office, return to classes, go back to Allen's office, and then head to her sports practice.  (*Id.* ¶ 32.)

When Jane Doe 1 started dating, Allen insisted that she provide him with specific details about the relationships.  Allen often called Jane Doe 1 in the evening and on weekends at the end her sophomore year.  Initially, they talked about soccer, but the calls became more personal. When Jane Doe 1 met her male friends outside of school, Allen became jealous and talked inappropriately with her about sex.  Topics included sexual acts between Allen and other teachers, as well as teachers that Allen found sexually attractive.  (*Id.* ¶¶ 33–35.)

Allen continued his phone calls with Jane Doe 1 throughout her sophomore and junior years. The calls were very long, with topics ranging from school, boys, relationships, personal issues, and

intimate information.  Jane Doe 1 tried to end the calls around 11:00 p.m.  Allen also regularly messaged Jane Doe 1 on Facebook.  (*Id.* ¶¶ 36–37.)

Allen used his authority to get Jane Doe 1 out of class so she would come to his office.  If she did not come to his office, Allen would remotely control Jane Doe 1's computer, causing it to malfunction so that she would need to go see Allen anyway.  If Allen was unable to remotely access Jane Doe 1's computer, Allen would call Jane Doe 1's classroom and request a hall pass for her, claiming it was for an IT issue.  If Jane Doe 1 refused to come to Allen's office when requested, he would become angry.  Jane Doe 1's teachers were often confused about why she was absent so often, wondering why she could not drop off her laptop with Allen instead of staying in his office. (*Id.* ¶¶ 38–39.)

Beginning in her sophomore year, Allen would hold Jane Doe 1 with very tight hugs.  In Jane Doe 1's junior year, Allen touched her in inappropriate areas, including her breasts and buttocks.  Allen whispered in Jane Doe 1's ear and tickled her so she fell off her chair onto the floor.  He pinned her against the wall and continued to touch and tickle her, to the point that Jane Doe 1 could not move with Allen up against her body.  Allen regularly pushed himself against her breasts, groin, and private body parts so she could not move.  He kissed her against her wishes.  All of this happened in Allen's office when his office door was closed.  (*Id.* ¶ 42.)

Continuing in her junior year, Allen often told Jane Doe 1 that he could not fully hug her because he had an erection.  Still, Allen would grab Jane Doe 1 and press his body, with his erection, against her.  He grabbed her buttocks and breasts.  He would hold her tight, pressing himself against her breasts, groin, and private areas, putting his head on her shoulders.  (*Id.* ¶¶ 43–44.)

Jane Doe 1 was not comfortable with these behaviors, and she told Allen to stop on at least three occasions. Each time, Allen temporarily stopped, but resumed shortly thereafter. Jane Doe 1 did not acquiesce to the behavior but, given the age and power disparities between them, did not know what to do to stop Allen's actions. Having gained her trust over two years, Jane Doe 1 also felt desensitized to Allen's conduct by her junior year. (*Id.* ¶ 42.)

Allen tried to convince Jane Doe 1 that she should play college soccer. He insisted on having private practices with her on the weekends and after school hours to train her for college. After practices and games, he would sit in her car for hours, refusing to leave. Allen would instruct her to drive to a church parking lot so nobody would see him with a female student. Jane Doe 1 wanted to leave and go home, but he would not get out of the car. Initially, Allen did not touch her in the car. However, Allen's behavior eventually escalated, and he began touching her thigh, groin, and hair. These actions were unwelcomed and unwanted. (*Id.* ¶¶ 45–47.)

In one instance during her senior year, Allen took Jane Doe 1 to a park for private soccer practice. Allen had Jane Doe 1 perform soccer drills, and if she made an error, she would have to do exercises as punishment. Jane Doe 1 made a mistake, and Allen told her she had to do five "happy stars." Jane Doe 1 did not like this exercise and pleaded with Allen to not make her do it. Allen noticed Jane Doe 1 watching a group of teenage boys walking by, and he said that Jane Doe 1 could give him a blowjob instead. Jane Doe 1 was horrified and attempted to avoid Allen after that incident. Jane Doe 1 tried to pull back from Allen and avoid going to his office during the second half of her junior year. This was difficult, however, as Allen continued pulling her out of class. (*Id.* ¶¶ 48–49.)

During Jane Doe 1's junior year, while investigating an unrelated incident, Northside's resource officer observed on surveillance footage that Jane Doe 1 had been in Allen's office for

more than two hours with the door closed.  Assistant Principal McCracken met with Allen to talk about this behavior.  However, no action was taken, except installing a swinging half-door in Allen's office separating the entrance of the office from the area behind the table and counters where Allen sat and instructing Allen to keep the door open when students were in his office. McCracken and other administrators attempted to create a policy that students could not cross past the swinging half-door in Allen's office.  (*Id.* ¶ 50.)  However, plaintiffs allege that no Northside employees, including the School Administrators, teachers, coaches, and other staff ever enforced this policy.  There was no legitimate enforcement mechanism, as Allen was charged with enforcing the policy himself.  The School Administrators, coaches, teachers, and other staff were aware that Allen continued to shut his door and visit behind closed doors with Jane Does 1–5, but no further action was taken.  (*Id.* ¶ 51.)

Allen was "furious and violently angry" about these policies.  (*Id.* ¶ 52.)  After he left the meeting with Assistant Principal McCracken, he punched multiple items in the back part of his office, picked up his tools, and threw them at the wall.  Jane Doe 1 was in the room during this violent outburst, and Jane Doe 2 learned of it later from Allen.  Allen told Jane Does 1 and 2[3] that the school was targeting him, and he expressed his anger about Assistant Principal McCracken, using profanities and stating he wished that she would be fired.  (*Id.*)

During Jane Doe 1's senior year, Allen continued to entertain female students, including Jane Does 1 and 2, in his office with the door closed.  Nobody, including the School Administrators, made any attempt to assure the safety of Jane Does 1 and 2, among other female students.  Allen continued to pull female students, including Jane Does 1 and 2, out of class and have them sit in his

---

[3] The court infers from the allegations in the complaint that Jane Does 1 and 2 are sisters.  (*See* Am. Compl. ¶ 77 ("Jane Doe 1 and 2's father met with Assistant Principal Christopher Morris . . . .").

office, with the door closed.   On numerous occasions, the school resource officer found Allen with

female students, including but not limited to Jane Does 1 and 2, in his office when the school

resource officer was closing the school.  (*Id.* ¶ 53.)

        *b.  Jane Doe 2*

Jane Doe 2 was a student at Northside from August 2017 through May 2021.  When Jane

Doe 2 became a freshman student at Northside, she would have breakfast and other meals with

Allen in his office.  Allen gave her rides, helped her with math, and initiated personal conversations.

When Jane Doe 1 graduated from Northside at the end of the 2019 school year, Allen's conduct

escalated and worsened in the summer of 2019 and into the beginning of Jane Doe 2's junior year.

(Am. Compl. ¶¶ 55, 57.)

As he did with Jane Doe 1, Allen pulled Jane Doe 2's class schedule and called her out of

class.  None of the teachers questioned these requests or prevented Jane Doe 2 from leaving class or

study hall to be alone with Allen in his office.  This was after the half-door was installed in Allen's

office.  (*Id.* ¶ 59.)

Allen would frequently hug Jane Doe 2 for prolonged periods of time.  Allen refused to let

go during the hugs, pressing his body against Jane Doe 2's breasts, groin, and private areas.  Jane

Doe 2 could feel Allen's erect penis during these interactions.  (*Id.* ¶ 58.)  Allen touched Jane Doe

2's hands and hair against her will.  He played with the hairbands that Jane Doe 2 kept on her wrists

and insisted that Jane Doe 2 give him one of her hairbands so he could have something of hers.  (*Id.*

¶ 61.)  When Allen gave Jane Doe 2 rides home or they went out to eat, Allen would put his hand

on her thigh, starting on the outside, then moving his hand to the inside of her leg.  (*Id.* ¶ 62.)

Allen commented on Jane Doe 2's clothes when they were alone in his office, specifically

remarking on her shirts and jeans as being tight and making other inappropriate comments

regarding her appearance.  He asked her to send him pictures of her in her underwear and in a bikini in 2019 and 2020.  (*Id.* ¶ 60.)  Allen made comments about Jane Doe 2's body, calling her "cute," "sexy," "hot," and "curvy."  (*Id.* ¶ 65.)

Allen questioned Jane Doe 2 about her sex life.  He talked about female students and teachers with whom he wanted to have sex.  Allen would get angry if Jane Doe 2 mentioned a boy and stop talking to her that day, making her apologize.  (*Id.* ¶¶ 63, 66.)

Allen said he dreamed about and wanted to kiss Jane Doe 2, discussing other sexual things he wanted to do with her.  Allen would compare Jane Doe 2 to her friends in a sexual manner. Allen would tell Jane Doe 2 that he had sexual feelings for her but threatened her by saying if she disclosed his comments, he would get into trouble, be mad at her, and their friendship would be ruined.  (*Id.* ¶¶ 67–68, 70.)

Allen communicated regularly with Jane Doe 2 after school hours and on the weekends.  He communicated via text messages, cell phone calls, and Snapchat.  The calls were long, over an hour and a half at times.  Allen said raunchy, suggestive, sexually explicit things to Jane Doe 2.  In 2019, Allen spoke with Jane Doe 2 over fifty times on the phone, totaling 1,308 minutes of talking time. Allen saved Jane Doe 2's contact information in his phone as "Boooo," suggesting a common shorthand for one's girlfriend or boyfriend.  Allen would also come to Jane Doe 2's house after school hours, saying raunchy, suggestive, and sexually explicit things to her in person.  (*Id.* ¶¶ 71–73.)

Allen's behavior became so extreme that Jane Doe 2 told her parents about it in the fall of 2020, her senior year.  At that time, Jane Doe 2 made efforts to cut Allen out of her life.  Allen was very angry.  Just as he did with Jane Doe 1, Allen accessed Jane Doe 2's computer, forcing her to come to his office for repair.  Allen would also read Jane Doe 2's personal messages on her laptop.

(*Id.* ¶ 74.)  Jane Doe 2 unfriended Allen on Snapchat.  Allen responded by calling Jane Doe 2 into his office and warning her that if she discontinued their friendship, he would not help her with her computer or give her rides.  (*Id.* ¶ 75.)

Amid the COVID-19 pandemic, Jane Doe 2 feared participating in virtual school classes because she was worried that Allen would interfere and contact her.  On multiple occasions, Allen called Jane Doe 2 and told her what was going on in her Zoom meetings, indicating that he was observing her.  (*Id.* ¶ 76.)

After Jane Doe 2 told her parents about Allen's behaviors, Jane Doe 1 and 2's father met with Assistant Principal Morris in November 2020 to address the issue.  Morris seemed concerned and offered to help Jane Doe 2 with her computer, recommending that Jane Doe 2 take her laptop to the front desk instead of to Allen if she had computer issues.  On her own, Jane Doe 2 modified her class schedule in an effort to avoid passing by Allen's office.  However, Morris ultimately took no action in response to the information provided to him by Jane Doe 1 and 2's father.  At the end of Jane Doe 2's senior year, when Jane Doe 2 went in to return her laptop, Morris stated that he did not remember the conversation with Jane Doe 2 and her father.  (*Id.* ¶¶ 77–78.)

After meeting with Assistant Principal Morris, Principal Green called the father of Jane Doe 1 and 2 and told him not to worry about Allen.  However, Principal Green took no action in response to the information that was provided the father of Jane Doe 1 and 2.  (*Id.* ¶ 79.)

c.  *Jane Doe 3*

Jane Doe 3 was a student at Northside from August 2015 through May 2019.  She first met Allen during the fall semester of her freshman year.  Jane Doe 3's school-issued laptop computer had been damaged, and she took it to Allen for repairs.  Allen told her it would cost $500 to $600 to fix the laptop.  When Allen called Jane Doe 3 to his office to pick up the laptop, Allen claimed that

he went days without sleeping to repair her laptop, and that he convinced the school administration not to charge Jane Doe 3 for the damage.  Allen told Jane Doe 3 that she owed him "big time."  (*Id.* ¶¶ 81–83.)

Allen presented himself to Jane Doe 3 as a safe space, someone in whom she could confide, much like an older brother.  Jane Doe 3 would often tell Allen things she would not even talk about with counselors.  (*Id.* ¶ 85.)

Like what he did with Jane Does 1 and 2, Allen used his power as IT Specialist to remotely control Jane Doe 3's computer and cause it to malfunction.  When Jane Doe 3 visited Allen for these computer-related reasons, Allen would not work on her laptop right away, instead inviting her to sit down.  He would tell Jane Doe 3 that since she could not finish her work without her laptop anyway, she should stay in his office.  She would often be in Allen's office for entire class periods.  Allen would not let Jane Doe 3 look at the laptop he was fixing.  (*Id.* ¶ 87.)

Jane Doe 3 spent much of her time in study hall in the library.  Allen would frequently enter the library, which connected to his office via a passageway, and attempt to get Jane Doe 3 to visit his office.  Northside's librarian would tell Allen to leave Jane Doe 3 alone; still, no one reprimanded Allen or attempted to correct this behavior.  (*Id.* ¶ 88.)

In March 2016, when Jane Doe 3 was still a freshman and only 15 years old, Allen added Jane Doe 3 as a Facebook friend.  Allen and Jane Doe 3 did not interact on Facebook beyond that, but Allen would often make comments to Jane Doe 3 about her posts and photos.  (*Id.* ¶ 89.)

Between Jane Doe 3's freshman year and the first semester of her junior year, Allen would engage in conversations with Jane Doe 3 about her family life and her relationships, sexual and otherwise.  Allen asked whether Jane Doe 3 was a virgin, had viewed pornography, or had seen a penis.  If Jane Doe 3 refused to answer, Allen became angry, claiming that he was "just trying to

keep her safe." (*Id.* ¶ 90.)   Allen also made comments about Jane Doe 3's appearance, calling her pretty and saying things such as "you're filling out nicely," "I hope you're wearing pants with that," and "damn you look fine today." (*Id.* ¶ 91.)

However, if Jane Doe 3 discussed liking someone romantically or dating, Allen would become upset.  When she first started seriously dating a boyfriend, Allen would more frequently ask Jane Doe 3 questions of a sexual nature.  If Allen passed by Jane Doe 3 and her boyfriend kissing, he would stop and stare.  Unlike Jane Does 1 and 2, Jane Doe 3 refused Allen's offer to give her rides outside of school, which upset him.  (*Id.* ¶¶ 92–93.)

Between Jane Doe 3's freshman year and the first semester of her junior year, Allen would rub Jane Doe 3's lower back, kiss the top of her head, and touch her breasts.  This happened with relative frequency, once every few weeks.  (*Id.* ¶ 94.)

Jane Doe 3's frequent interactions with Allen and absences from class did not go unnoticed by Northside's administration and staff, including Jane Doe 3's teachers.  When teachers asked why she was in Allen's office for so long, Jane Doe 3 would tell them that Allen wanted her to have a "brain break."  Northside teachers accepted this explanation without question and did nothing to limit Jane Doe 3's interactions with Allen.  (*Id.* ¶ 95.)  Jane Doe 3 was aware of the open-door policy and "line" in Allen's office that students were not supposed to cross.  However, Jane Doe 3 observed that it was never enforced.  The door to Allen's office would often remain closed.  (*Id.* ¶ 96.)

About midway through Jane Doe 3's junior year, Allen asked for Jane Doe 3's cell phone number.  She refused.  From that point on, Jane Doe 3's school-issued laptop no longer suffered from technical issues.  Additionally, Allen began to ignore Jane Doe 3, and he would no longer

keep her in his office for long periods of time.  Jane Doe 3 continued to observe Allen inviting female students into his office, with the doors closed, for hours at a time.  (*Id.* ¶¶ 97–99.)

> ### d.  Jane Doe 4

Jane Doe 4 was a student at Northside from August 2015 through May 2019.  Jane Doe 4 met Allen during her freshman year when she picked up her laptop from the library that fall.  (*Id.* ¶¶ 101–02.)

When Jane Doe 4 first entered Allen's office, he kept her there for about three hours.  At that time, Jane Doe 4 had been in the foster care system for around one year and did not know anyone at Northside.  Allen presented himself as, and Jane Doe 4 considered him to be, a safe space, in whom vulnerable girls could confide, much like an older brother.  Thus, Jane Doe 4 considered Allen a mentor, and she would often confide in him on topics that she would not talk about with others, even counselors.  (*Id.* ¶¶ 103, 105.)

As he did with Jane Does 1–3, Allen used his power as IT Specialist to remotely control Jane Doe 4's computer, causing it to malfunction so she would have to go see him.  Jane Doe 4 observed Allen remotely controlling her computer's cursor.  Allen would also remotely access the webcam on her computer, giving him the ability to watch Jane Doe 4 as she used her computer for classes and schoolwork.  Eventually, Jane Doe 4 covered up the webcam with tape.  When Jane Doe 4 was in the library, Allen would pull her out of the library and bring her to his adjacent office.  Jane Doe 4 would be alone with Allen in his office, with the door closed, multiple times per week.  Allen would tell her to stand behind the door to the office to prevent passersby from seeing them.  Allen told other girls the same thing.  (*Id.* ¶¶ 106–08.)

Allen commented on Jane Doe 4's outfits, looks, and dating.  He would become upset if she was dating or attracted to someone.  Allen initiated physical contact with Jane Doe 4 beginning in

her sophomore year.  He would touch her shoulders and half-hug her for four to five seconds at a time.  During these embraces, Allen's arm would be around her waist, and his body would be up against Jane Doe 4's breasts and buttocks.  Allen repeatedly asked Jane Doe 4 to give him her social media information, but she refused.  (*Id.* ¶¶ 109–11.)

During her junior and senior year, Jane Doe 4 expressed her discomfort and concerns about Allen to Northside's administration, including Assistant Principals McCracken and Morris, on several occasions.  Jane Doe 4 complained to McCracken about Allen keeping his door closed, including after Northside purported to implement an open-door policy.  McCracken typed on her computer as Jane Doe 4 was meeting with her, indicating that McCracken was taking notes, and said not to worry about it and that the school would take care of it.  Jane Doe 4 made similar comments to Allen, who also told her not to worry about it and that the school would take care of it. (*Id.* ¶¶ 112–14.)

e. *Jane Doe 5*

Jane Doe 5 was a student at Northside from August 2018 through December 2019.  Jane Doe 5 met Allen when she was in middle school, in eighth grade, through family connections. When she enrolled in Northside as a freshman, her interactions with Allen became more frequent. (*Id.* ¶¶ 117–19.)

While Jane Doe 5 was a student at Northside, she had a troubled home life.  Accordingly, she looked up to Allen as a trusted and stable adult.  In one instance, Jane Doe 5, together with Jane Doe 1 and another female student, wrote "Coach Allen" on their arms in marker and posed for a picture with Allen.  (*Id.* ¶ 121.)

Allen gave Jane Doe 5 his personal contact information, including his Instagram, Snapchat, Facebook, email, and cell phone number.  Allen told her not to tell anyone because he "could get in

trouble."  Allen communicated with Jane Doe 5 via Snapchat and text message.  Allen would also view what Jane Doe 5 had posted on social media and talk to her about it.  (*Id.* ¶¶ 123–24.)

As he did with other female students, Allen used his authority as IT Specialist to pull Jane Doe 5 out of class.  For instance, while in class, Jane Doe 5 would be called into Allen's office regarding some issue with her computer.  This was merely a pretext; when she would arrive in Allen's office, Allen would tell Jane Doe 5 he just wanted to say "hi," and the two would begin to talk alone in his office.  (*Id.* ¶ 125.)

Allen discussed numerous personal topics with Jane Doe 5, including her home and personal life, her intimate relationships, the intimate relationships of her classmates, and sex.  If Jane Doe 5 made a joke about Allen, or Allen became upset with her for other reasons, Allen's attitude would become colder, and he would begin ignoring Jane Doe 5.  (*Id.* ¶¶ 126–27.)

Allen personally coached Jane Doe 5 in soccer.  They would practice at the school's soccer field and at Fallon Park, over seven miles away from Northside.  Allen drove Jane Doe 5 to and from soccer practice, school, and her home.  After soccer practice, Allen frequently took Jane Doe 5 to get ice cream.  During one such outing, Allen warned Jane Doe 5 to make sure she did not tell anyone about it.  (*Id.* ¶¶ 128–29.)

Allen frequently hugged Jane Doe 5 in an overlong and inappropriate manner.  During these embraces, Allen's arms would be fully wrapped around Jane Doe 5, and his body would be pressed against her breasts.  (*Id.* ¶ 130.)

Later in the first semester of her sophomore year, Jane Doe 5 tried to distance herself from Allen.  In response, Allen became very passive aggressive towards her.  In December of 2019, midway through her sophomore year, Jane Doe 5 transferred from Northside to Salem High School. (*Id.* ¶¶ 131–32.)

**B.  Plaintiffs' Claims and Defendants' Asserted Grounds for Dismissal**

Relevant to this motion to dismiss, plaintiffs allege a violation of Title IX as to the School Board (Count One), Section 1983 claims against all the defendants as to equal protection violations (Count Two) and substantive due process violations (Count Three), Section 1983 violations against the School Board and School Administrators for failure to train (Count Four) and supervisory liability (Count Five), and state law claims against the School Administrators for gross negligence (Count Six) and intentional infliction of emotional distress (Count Eight).

In their motion to dismiss, defendants assert that the two-year statute of limitations bars any Title IX and Section 1983 claims by Jane Does 1, 3, and 4.  As to Title IX, the School Board further asserts that there are no allegations that the School Board had actual knowledge about Jane Does 1, 3, 4, and 5 or that the School Board was deliberately indifferent to Doe 2.  Regarding Section 1983, the School Board asserts that it is the final policymaker and the complaint lacks allegations regarding any policy or custom of the School Board itself.  The School Administrators assert that the complaint is deficient as to supervisory liability and failure to train and that they are entitled to qualified immunity.  Regarding plaintiffs' state law claims, the School Administrators argue that the court should decline to exercise supplemental jurisdiction over those claims because the federal claims are subject to dismissal.  The School Administrators also find inadequacies in the state claim allegations, and specific defendants note that they should not be held responsible during periods of time that they were not working at the school.

At the hearing on the motion, plaintiffs agreed that Jane Does 1, 3, and 4 cannot state any claims against Assistant Principal Breeding or Principal Green because Breeding and Green did not work at Northside while these plaintiffs were students at Northside.  Jane Doe 5 also agrees that she does not have any claims against Principal Green for the same reason.

## II.  ANALYSIS

### A.  Motion to Dismiss Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the complaint's legal and factual sufficiency.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–63 (2007).  To withstand a motion to dismiss under Rule 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.  The court presumes as true the complaint's factual allegations and construes these allegations in the light most favorable to the non-moving party.  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).  Nevertheless, the court need not accept a complaint's legal conclusions drawn from the facts, *see Iqbal*, 556 U.S. at 679, nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments," *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

### B.  The Statute of Limitations Bars the Title IX and Section 1983 Claims of Jane Does 1, 3, and 4.

Applying Virginia Code § 8.01-243(A),[4] defendants argue that Jane Doe 1, 3, and 4's Title IX and § 1983 claims are barred by Virginia's two-year statute of limitations (the general statute of limitations for personal injury actions) because the claims of these three plaintiffs could not have accrued later than May of 2019, when they graduated from Northside.  Jane Doe 1 filed her complaint on March 22, 2022, and Jane Does 3 and 4 joined the suit when the amended complaint was filed on June 1, 2022, – more than two years after accrual.  Thus, defendants argue that these claims are time-barred.  Plaintiffs argue that Virginia Code § 8.01-243(D),[5] which pertains to

---

[4] Virginia Code § 8.01-243(A) reads, in pertinent part, "Unless otherwise provided in this section or by other statute, every action for personal injuries, whatever the theory of recovery, and every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues."

[5] Virginia Code § 8.01-243(D) reads, in pertinent part, "Every action for injury to the person, whatever the

injuries resulting from sexual abuse, sets forth a twenty-year statute of limitations and should be applied here.  They assert that subsections A and D of Virginia Code § 8.01-243 do not constitute multiple statutes of limitation for personal injury actions.  Instead, plaintiffs argue, they are part of a single general or residual statute of limitation for personal injury actions, providing a period of two years "[unless] otherwise provided in this section or by other statute," and going on to, within the same code section, provide an extended limitations period for all personal injuries involving sexual abuse of an infant or minor.  Va. Code § 8.01-243.

For the § 1983 claims, plaintiffs' argument must be rejected because courts "borrow and apply to *all* § 1983 claims the *one* most analogous state statute of limitations," which is the state's general or residual personal injury statute of limitations.  *Owens v. Okure*, 488 U.S. 235, 240–41 (1989) (emphasis added).  Earlier, in *Wilson v. Garcia*, 471 U.S. 261 (1985), the Supreme Court held that courts should apply a state's statute of limitations for personal injury actions in § 1983 cases.  The Court reasoned that the earlier practice of applying the most analogous state statute of limitations "bred confusion and inconsistency in the lower courts and generated time-consuming litigation" and that it was often a matter of "artful pleading."  *Owens*, 488 U.S. at 240.  In *Owens*, it was faced with a situation where a state had multiple personal injury statutes of limitation. Applying that same reasoning and to provide "a rule … that can be applied with ease and predictability in all 50 States," *id*. at 243, the Court held that where "state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions," *id.* at 249–50.  Following that precedent,

---

theory of recovery, resulting from sexual abuse occurring during the infancy or incapacity of the person as set forth in subdivision 6 of 8.01-249 shall be brought within 20 years after the cause of action accrues."  Sexual abuse is defined as "an act committed with the intent to sexually molest, arouse, or gratify any person, where:  a.  The accused intentionally touches the complaining witness's intimate parts or material directly covering such intimate parts; [or] b.  The accused forces the complaining witness to touch the accused's, the witness's own, or another person's intimate parts or material directly covering such intimate parts . . . ."  Va. Code § 18.2-67.10(6).

Virginia federal courts have consistently applied the two-year limitations period for § 1983 actions, even for claims involving sexual abuse. *Shelton v. Angelone*, 148 F. Supp. 2d 670, 677 (W.D. Va. 2001) ("The court concludes that under . . . *Owens*, the court must apply the two year limitation period set forth in § 801.243(A) to all § 1983 actions arising in Virginia."); *Graham v. City of Manassas*, 390 F. Supp. 3d 702, 709 (E.D. Va. 2019) (applying § 801.243(A) to bar § 1983 claims based on a school employee's sexual abuse of children).

Likewise, with respect to the Title IX claims, courts in the Fourth Circuit have applied the general state statute of limitations for personal injury to Title IX claims. *See, e.g., Wilmink v. Kanawha Cnty. Bd. of Educ.*, 214 F. App'x 294, 296 n.3 (4th Cir. 2007) ("[E]very circuit to consider the issue has held that Title IX also borrows the relevant state's statute of limitations for personal injury."); *Doe v. Va. Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d 479, 496 (W.D. Va. 2019) (applying two-year statute of limitations to Title IX claims); and *Graham*, 390 F. Supp. 3d at 709 (E.D. Va. 2019) (borrowing two-year statute of limitations from Va. Code § 8.01-243(A) for Title IX and Section 1983 claims).

In support of their position, plaintiffs cite to only one case from a district court in another circuit that concluded that an Ohio statute of limitations for sexual abuse, rather than the general personal injury statute of limitations, applied to causes of action under Title IX. *Doe v. Cleveland Metro. Sch. Dist. Bd. of Educ.*, 533 F. Supp. 3d 567 (N.D. Ohio 2021), *motion for reconsideration denied*, 2021 WL 3284264 (N.D. Ohio Aug. 2, 2021). The court declines to follow this holding as it is contrary to case law in the Fourth Circuit and for the same reasons articulated in *Wilson* and *Owens*. Further, the holding and reasoning of *Cleveland Metropolitan* has not been adopted by any other court. *Cleveland Metropolitan* is also distinguishable to the extent it relies on Ohio case law. 533 F. Supp. 3d at 574 (recognizing that "[a]lthough federal law governs the question of which

statute of limitations applies to Title IX, the Ohio Supreme Court's opinion on the scope of Section 2305.111(C) provides persuasive authority that confirms the Court's determination here.").  A ruling by the Ohio Supreme Court is not relevant to determining the applicable limitations period for a Title IX claim arising in Virginia.

For these reasons, the court finds that Jane Does 1, 3, and 4's § 1983 and Title IX claims are time-barred.[6]

**D.  Title IX Claim as to Jane Does 2 and 5 Against the School Board**

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  To establish a Title IX sexual harassment claim, a plaintiff must show: (1) she was a student at an educational institution receiving federal funds; (2) she suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived her of equal access to the educational opportunities or benefits provided by her school; (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and (4) the school acted with deliberate indifference to the alleged harassment.  *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021).  The School Board does not contest that plaintiffs have adequately pled the first element.

**1.  Severe, pervasive, and objectively offensive**

Courts evaluate whether the harassment was severe, pervasive, and objectively offensive by considering "a constellation of surrounding circumstances, expectations, and relationships."  *Davis*

---

[6] Defendants do not assert the statute of limitations as a ground for dismissal as to the state claims in Counts Six and Eight.

*v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).  The question is whether the harassing

conduct "is so severe, pervasive, and objectively offensive that it denies its victims the equal access

to education that Title IX is designed to protect."  *Id.* at 652.  A student is denied equal access to the

school's educational opportunities and benefits if the harassment "(1) results in the physical

exclusion of the victim from an educational program or activity; (2) so undermines and detracts

from the victim's educational experience as to effectively deny her equal access to an institution's

resources and opportunities; or (3) has a concrete, negative effect on the victim's ability to

participate in an educational program or activity."  *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 275.

Defendants do not contest that the claims of Jane Doe 2 satisfy these conditions but do argue

that the harassment suffered by Jane Doe 5 was not severe, pervasive, and objectively offensive.

The court is confused by this argument because Allen's conduct with all five plaintiffs, as alleged in

the complaint, was essentially the same.  In any event, the court has little trouble concluding that

Allen's discussion of personal sex preferences with Jane Doe 5 and hugging her inappropriately

with his body pressed against her breasts would have a negative effect on her ability to participate in

school programs.  Indeed, she transferred schools.

Plaintiffs Jane Doe 2 and 5 have plausibly alleged that they were subjected to severe,

pervasive, and objectively offensive conduct.

### 2.  Notice

"[W]hen a school official with authority to address complaints of sexual harassment and to

institute corrective measures receives a report that can objectively be construed as alleging sexual

harassment, that receipt establishes actual notice of such harassment for Title IX purposes."  *Fairfax

Cnty.*, 1 F.4th at 265.  "[A] school's receipt of a report or complaint alleging sexual harassment is

sufficient to establish actual notice under Title IX.  This is an objective inquiry which asks whether

an appropriate official in fact received such a report or complaint and whether a reasonable official would construe it as alleging misconduct prohibited by Title IX." *Id.* at 268.

Defendants argue that the School Board did not receive notice and did not have any knowledge of harassment with respect to Jane Doe 5. Essentially, the School Board argues that it was not aware of any misconduct by Allen until the complaint by Jane Doe 2's father. This argument relies on a narrow, cabined reading of the amended complaint. The allegations demonstrate that the School Administrators knew Allen developed inappropriate relationships with all five of the plaintiffs, spending inordinate amounts of time with them, both outside of school and behind the closed door of his office. Under an "objective inquiry" that asks "whether a reasonable official" would construe this as a situation involving potential misconduct under Title IX, *Fairfax Cnty.*, 1 F.4th at 268, plaintiffs have plausibly alleged that the School Board had notice or knowledge of the alleged harassment.

More specifically, in 2017, a Northside resource officer told Assistant Principal McCracken that Jane Doe 1 had been in Allen's office for over two hours with the door closed. McCracken met with Allen about this behavior and installed a swinging half-door, but after that meeting, Allen was still allowed to close his door without any repercussions. The resource officer also found Allen alone in his office with female students, including Jane Doe 1 and 2, when the officer was closing the school for the day. A reasonable official would construe these complaints by the resource officer as alleging misconduct by Allen, and the school's decision to install a swinging half-door demonstrates its awareness of, or belief in, such misconduct. In addition, Jane Doe 3's frequent interactions with Allen caught the attention of the school librarian; Jane Doe 4 complained to Assistant Principals McCracken and Morris about her discomfort and Allen keeping his door closed; and, given everything else, it is plausible that Jane Doe 5's teacher would have been

suspicious of her being called out of class to see Allen due to IT issues.  Ultimately, the School

Administrators, as well as other staff, knew generally that Allen spent excessive amounts of time

with all five plaintiffs, both at school and away from school.  Taking these allegations together, the

court finds that plaintiffs have plausibly alleged that the School Board had notice or knowledge of

Allen's alleged harassment.

### 3.  Deliberate indifference

Under Title IX, a school acts with deliberate indifference where its "response to the

[alleged] harassment or [the] lack [of any such response] is clearly unreasonable in light of the

known circumstances." *Fairfax Cnty.*, 1 F.4th at 271 (quoting *Davis v. Monroe Cnty. Bd. of Educ.*,

526 U.S. 629, 648 (1999)).  Deliberate indifference is a high standard that requires more than a

showing of mere negligence, *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001), but "half-

hearted investigation or remedial action will [not] suffice to shield a school from liability," *S.B. ex*

*rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016).

Based on the allegations in the complaint, "half-hearted" is an accurate description of

defendants' response to Allen's alleged harassment.  The closed-door policy was basically ignored

and not enforced.  Jane Doe 2 was told only to avoid Allen; this is not an effective strategy to

prevent harassment, and moreover, the onus should not be placed on a high school student to take

his or her own measures to avoid being harassed.  Defendants argue that Allen's conduct abated

after Jane Doe 2's father spoke with Assistant Principal Morris, but plaintiffs' allegations suggest

instead that this was due to measures Jane Doe 2 undertook on her own, such as altering her class

schedule.  Crediting the allegations as true, as the court must at this stage, it appears that the School

Administrators mostly did nothing, and the little they did do was unreasonably insufficient, given

what they knew about Allen's behavior with female students.  Plaintiffs have plausibly alleged deliberate indifference.

**E.  Section 1983 Claims as to Jane Does 2 and 5**

Section 1983 "is not an independent source of substantive rights, but simply a vehicle for vindicating preexisting constitutional and statutory rights." *Safar v. Tingle*, 859 F.3d 241, 243 (4th Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 393–94 (1989)).  The statute imposes civil liability on any person who, acting under color of state law, deprives another person of rights and privileges secured by the Constitution and laws of the United States.  42 U.S.C. § 1983.

**1.  Claims against the School Board**

Plaintiffs argue that they have pled sufficient facts to state *Monell* claims against the School Board.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  The *Monell* claims relate to the School Board's alleged violations of equal protection, violations of substantive due process, failure to train, and supervisory liability (counts two through five).[7]  There are three necessary elements for *Monell* liability.

First, the plaintiff must plausibly allege a constitutional harm that stems from the acts of a municipal employee "taken in furtherance of some municipal 'policy or custom.'"  *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694).  A policy or custom can exist in four ways:

> (1) through an express policy, such as a written ordinance or regulation;
> (2) through the decisions of a person with final policymaking authority;

---

[7]  At oral argument, the court questioned the viability of a *Monell* claim based on a theory of supervisory liability.  Plaintiffs were unable to provide any cases to support such a claim.  As one district court has stated, "it is not clear that the Fourth Circuit has established that supervisory liability principles apply to municipalities, although other courts have suggested that municipalities might be liable for failure to supervise an officer." *Moody v. City of Newport News*, 93 F. Supp. 3d 516, 540 (E.D. Va. 2015) (citing *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998)).  In *Liebe*, the Eighth Circuit reasoned that a failure to supervise claim was not distinct and separate from a failure to train claim because § 1983 does not have vicarious liability, and both claims are governed by a deliberate indifference standard. 157 F.3d at 579.  In the absence of any daylight between plaintiff's failure-to-train claim and supervisory liability claim against the School Board, the court will dismiss the latter as duplicative of the former.

> (3) through an omission, such as a failure to properly train officers, that
> 'manifests deliberate indifference to the rights of citizens'; or (4)
> through a practice that is so 'persistent and widespread' as to constitute
> a 'custom or usage with the force of law.'

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

Second, the plaintiff must allege facts showing that the policy's creation is fairly attributable to the municipality. *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014) ("Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the *sine qua non* of *Monell* liability.").

Third, the plaintiff must allege an affirmative causal link between the "policy or custom" and the injury suffered by the plaintiff. *Spell*, 824 F.2d at 1389.

### a. Official policies other than failure to train

Plaintiffs made several allegations pertaining to official policies and customs of the Roanoke County School Board. (*See* Am. Compl. ¶ 135 ("Defendants School Administrators made no effort to investigate, no effort to restrict Defendant Allen's one-on-one interactions with students, no effort to curtail Defendant Allen from inviting students into his office, and no effort to protect the welfare of the students entrusted to their control."); 141 ("Defendant School Board and Defendants School Administrators and other school officials had knowledge of Defendant Allen's improper behavior and abuses, but failed to address them, thereby enabling Defendant Allen to continue his pattern of sexual harassment, grooming, and abuse of female students, including Plaintiffs."); *see also id.* ¶¶ 137, 142, 151, 152, 167.) In sum, plaintiffs allege continued permissiveness by the School Board towards Allen's behavior with female students for several years, including the

plaintiffs.  These are plausible allegations of an official custom or policy that harmed the plaintiffs, one that is so persistent and widespread as to constitute a custom or usage with the force of law.

Defendants argue that only the School Board has final policymaking authority, and that the actions of the School Administrators do not represent the final policy of the School Board, citing *Riddick v. School Board of City of Portsmouth*, 238 F.3d 518 (4th Cir. 2000).  *Riddick* was a summary judgment decision, not a Rule 12(b)(6) decision.  As the *Riddick* court explained, "Although the Riddick plaintiffs correctly assert that final policymaking authority may be delegated, *there was no showing that the Board delegated any such authority in this case*."  *Id.* (emphasis added) (internal citation omitted).  At this stage, as opposed to summary judgment, plaintiffs are not required to make any type of showing as to whether the School Board delegated their authority to the School Administrators.  To the extent that policymaking authority is relevant, it is not unreasonable to infer from the amended complaint that the School Board delegated their authority.  Discovery may prove otherwise, but plaintiffs have plausibly alleged that the actions of the School Administrators can be attributed to the School Board.

### b. Official policies pertaining to failure to train

A school board can be liable under § 1983 for failure to train if its failure "in a relevant respect evidences a 'deliberate indifference' to" a student's constitutional rights.  *Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  "[O]nly if, 'in light of the duties assigned to specific . . . employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of the constitutional rights,' can [a school board] reasonably 'be said to have been deliberately indifferent to that need.'"  *Id.* (quoting *City of Canton*, 489 U.S. at 390).  In other words, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice . . . can a [school board] be liable for such failure under

§ 1983." *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000) (quoting *City of Canton*, 489 U.S. at 389).

Plaintiffs have alleged that the School Board and School Administrators failed to properly train and supervise staff at the school—such as teachers, coaches, and resource officers—regarding male employee sexual harassment, grooming, and abuse of female students.  They allege that school employees should have been trained in identifying, investigating, reporting, and stopping harassment, such as Allen's abuse of plaintiffs; defendants knew or should have known that their approach would fail to prevent tortious conduct; and the School Board and School Administrators did little, if anything, to stop Allen's behavior from continuing after becoming aware of it.  (Am. Compl. ¶¶ 185–187.)  It is important to note that the failure to train would extend to inadequate training of Allen himself about appropriate behavior of adults towards adolescent females in a school setting.  Thus, the School Board can be held liable on a failure-to-train theory.  *See, e.g.*, *Doe v. Russell Cnty. Sch. Bd.*, Case No. 1:16CV00045, 2017 WL 1374279, at *8 (W.D. Va. Apr. 13, 2017) (denying a Rule 12(b)(6) motion to dismiss a failure-to-train claim because plaintiff "plausibly asserted that the School Defendants' complete failure to train teachers and employees on how to spot, investigate, and address sexual assault amounted to deliberate indifference" and a jury "could find that the risk of sexual assault was so obvious that no pattern of unconstitutional behavior by school staff was necessary to put the School Defendants on notice of the need to train employees"); *Doe v. Reg'l Sch. Unit No. 21*, Dkt. No. 2:19-00341-NT, 2020 WL 2820197, at *4 (D. Me. May 29, 2020) (allegation that school district's failure to train school staff resulted in a deficient investigation and allowed teacher to have unsupervised access to student was "enough . . . to put the Defendants on notice that the Plaintiff's theory extends to a failure to train [school

officials] in how to investigate allegations that a teacher is engaging in sexual conduct with a student").

### c. Ratification

Finally, plaintiffs can prevail against the School Board on a ratification theory, "regardless of any contemporary knowledge or active participation in the initial unconstitutional actions of subordinate officials." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 535 n.4 (4th Cir. 2022). Plaintiffs have plausibly alleged ratification: that the School Board eventually became aware of Allen's actions and then ratified them by not intervening or imposing any discipline. (*See* Am. Compl. ¶¶ 188–89.)

### 2. Claims against School Administrators

Plaintiffs argue that they have stated a claim against the School Administrators on counts two (equal protection), three (substantive due process), four (failure to train), and five (supervisory liability). Counts two and three against the School Administrators are premised on supervisory liability.

### a. Supervisory liability

The Fourth Circuit has articulated three elements to establish supervisory liability under § 1983: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

Plaintiffs have satisfied the first two elements for the same reasons discussed above with respect to the notice and deliberate indifference elements of plaintiffs' Title IX claims.  Regarding the third element, plaintiffs have sufficiently alleged a causal connection between the School Administrators' lax supervision and plaintiffs' injuries.  For example, Allen was repeatedly allowed to be alone behind his closed office door with plaintiffs, where much of the alleged grooming and abuse occurred.  Therefore, defendants' motion to dismiss counts two, three, and five against the School Administrators will be denied.

### b.  Failure to train

To establish a failure-to-train claim, a plaintiff must show that: (1) the subordinate actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to properly train the subordinates, illustrating a "deliberate indifference" to the rights of the persons with whom the subordinate comes into contact; and (3) the failure to train actually caused the subordinate to violate the plaintiff's rights.  *Broderick*, 225 F.3d at 456.  Plaintiffs have stated a failure-to-train claim against the School Administrators for the same reasons discussed above with respect to the School Board.

### c.  Qualified immunity

The School Administrators assert that they are entitled to qualified immunity, so the court must analyze whether a constitutional violation occurred, and whether the right violated was clearly established—that is, "sufficiently clear that every reasonable official would understand" that his behavior violated the right at issue.  *Henry v. Purnell*, 652 F.3d 524, 534 (4th Cir. 2011).  Plaintiffs have plausibly alleged that the School Administrators violated their constitutional rights.  *See Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 396 (4th Cir. 2014) (explaining that a Rule 12(b)(6) motion based on qualified immunity "faces a formidable hurdle" and "is usually not

successful" because the plaintiff only needs to "state a claim that is *plausible* on its face")

(emphasis in original).  Plaintiffs' constitutional rights not to be sexually abused at school were

clearly established.  *See Russell Cnty.*, 2017 WL 1374279, at *11 (denying motion to dismiss based

on qualified immunity because plaintiff's "constitutional right to be free from school-based

molestation was clearly established at the time of these events").

## F.  State Law Claims

### 1.  Gross negligence

Gross negligence is "a degree of negligence showing indifference to another and an utter

disregard of prudence that amounts to a complete neglect of the safety of such other person."  *Elliot*

*v. Carter*, 791 S.E.2d 730, 732 (Va. 2016).  A reasonable jury could conclude that the lack of

measures put in place to stop Allen's behavior amounts to complete neglect.  Simply installing a

half-door and telling Allen to keep the door open is not enough, as a matter of law, to undermine

plaintiffs' plausible allegations of gross negligence—for example, that Allen continued meeting

with plaintiffs behind closed doors and defendants did nothing in response.

The court will deny defendants' motion to dismiss plaintiffs' gross negligence claim.  *See,*

*e.g.*, *Russell Cnty.*, 2017 WL 1374279, at *13 (denying motion to dismiss gross negligence claim

where plaintiff alleged that defendants "had knowledge of grooming behaviors and misconduct" by

school custodian and defendant "took no steps to monitor" custodian after an initial meeting); *D.J.*

*by and through Hughes v. Sch. Bd. of Henrico Cnty.*, 488 F. Supp. 3d 307 (E.D. Va. 2020) (denying

motion to dismiss gross negligence claim where allegations indicated defendants "had knowledge

about harassment in the . . . locker room and that their actions (ensuring adult supervision) in the

locker room could prevent similar incidents" and that the case "involves trained educators with the

responsibility for supervising hundreds of children failing to fulfill a basic duty to protect them")
(internal quotations omitted).

### 2.  Intentional infliction of emotional distress

A claim for intentional infliction of emotional distress has the following elements: (1) the
conduct was intentional; (2) the conduct was outrageous and intolerable; (3) the conduct and
distress are causally related; and (4) the distress is severe.  *Russo v. White*, 400 S.E.2d 160 (Va.
1991).  For purposes of this motion, plaintiffs have sufficiently pled outrageous, intentional conduct
causing severe emotional distress by the School Administrators.  *See Hatfill v. N.Y. Times Co.*, 416
F.3d 320, 337 (4th Cir. 2005) (affirming denial of motion to dismiss because while the plaintiff "did
not allege his emotional distress in such specific terms, . . . Rule 8—applicable in this diversity
case—did not require him to do so"); *Faulkner v. Dillon*, 92 F. Supp. 3d 493, 500–01 (W.D. Va.
2015) (denying motion to dismiss, noting that "substantive claims for intentional infliction of
emotional distress under Virginia law 'need not be pled [in federal court] with the degree of
specificity required by Virginia courts'") (quoting *Nelson v. Green*, No. 3:06-cv-00070, 2014 WL
131055, at *14 (W.D. Va. Jan. 14, 2014)).

### III.  CONCLUSION

For the reasons stated in this opinion, the court will grant defendants' motion to dismiss the
§ 1983 and Title IX claims of Jane Does 1, 3, and 4 as time-barred; the state law claims of Jane
Does 1, 3, and 4 against Breeding and Green; the state and federal law claims of Jane Doe 5 against

Green; and the claim for supervisory liability against the School Board.  The motion will be denied

in all other respects.  The court will issue an appropriate order.

      Entered: March 29, 2023.


*/s/ Elizabeth K. Dillon*
      Elizabeth K. Dillon
      United States District Judge